## CAMPBELL *vs.* CLARK.

1. In ascertaining the boundaries of lands purchased from the United States according to the government surveys, the boundary lines actually run and marked by the public surveyors are to be taken and considered as the true boundaries, although such marked boundaries may not correspond with the courses and distances. The sections and their subdivisions, thus ascertained, are to be considered as containing the exact quantity expressed in the returns of the surveyors, whatever may be the actual quantity contained in such sections and subdivisions.— See S. C., 6 Mo. Rep., p. 219.

2. In surveys of land, it is a well-settled rule that the courses and distances must yield to an ascertained corner or boundary; and although such corner or boundary may have been effaced or destroyed, yet if the locality can be established by real testimony it will prevail, and the courses and distances must yield.

3. When the boundaries of land are fixed, known and unquestionable monuments must govern, although neither courses nor distances, nor the computed contents, correspond with such monuments.

## APPEAL from Ray Circuit Court.

Leonard, *for Appellant.*

1. The testimony of H. McAfferty, which was offered by the plaintiff, and rejected by the court, ought to have been received.

2. The instructions asked by the plaintiff, as to the boundaries of the half quarter section of land in dispute, were in conformity with the opinion of this Court, given when the case was last before this Court.— Campbell *vs.* Clark, 6 Mo. Rep., 221.

3. The instructions given by the Circuit Court, in lieu of the instructions asked by the plaintiff, were manifestly intended to induce the jury to find against the rule of law applicable to the case laid down by this Court, and so far as they are at all intelligible, are in direct hostility to that rule.

4. The finding of the jury is palpably against the evidence, and therefore the court erred in refusing the plaintiff a new trial.

KIRTLEY, *for Appellee.*

1. A purchaser, of the General Government, of a less quantity of land than a section, there being other purchasers and owners in the same section, should be entitled to an equal quantity of land with all others in the same section purchasing a like aliquot part.

2. A purchaser buying of the government — or deriving title from purchasers of the government — for a half quarter section of land, should be entitled to one-eighth of the whole section, whether the government surveyor had placed the half-mile marked trees on the exterior lines of such section at equi-distance from the marked corners or not.—Walters *vs.* Commons, 2 Porter's Ala. Rep., 38.

SCOTT, *Judge, delivered the opinion of the Court.*

This was an action of ejectment, brought by Campbell against Clarke, in which Clarke had a verdict and judgment.

It appears that Campbell was the owner of the east half of the south-west quarter of section 21, township 49, range 28; and that Clarke was the owner of the west half of the south-east quarter of the same section.

The division of the section, by a line running from one of the corners established by the public surveyor to the opposite corner, makes the half quarter section of Campbell contain $94\frac{41}{100}$ acres, and that of Clarke's, $64\frac{41}{100}$ acres. The question is as to the manner of subdividing the sections—whether the corners marked on the boundaries of sections by the public surveyor are to be regarded in subdividing a section among the several owners, or whether the same is to be divided by lines equi-distant from the several corners of the sections?

In making a survey of the twenty-first section, the surveyor reports, that in running the west line at 40 chains, he stopped and examined for quarter section corners, and found trees agreeing with the original field notes with the usual marks of quarter section corners, but neither the courses nor distances agreeing with the original field notes. Course continued 40 chains, making in all 80 chains, which brought him to a prairie. No sign of the original post or mound was to be seen. Thence east, and at 40 chains, found himself to be $20\frac{1}{2}$ links south of the old marked line. He then moved on to the old marked line, and searched

for the quarter section corner, but could find no timber, either in the course or distance of the description called for in the field notes. Course continued 5 chains, 4¾ links, where a Spanish oak, lying down and much decayed, was found, bearing S. 61 deg., E. 50 links; also, a white oak lying down dead, bearing N. 55½, W., 48 links. Course continued 34 chains, 94¼ links, making in all 80 chains— which brought him into an old improvement; no bearing trees to be found; all the timber having been destroyed in making the improvement, or by other means. Thence, north, his course exactly striking and following the old marked line, and at 79 chains, 56 links, he came to the beginning corner, falling about two feet west of it.

The original field notes of the survey of the south line of the said section, about which this controversy arises, called for post in mound, at the western corner. The witness trees of the middle corner were Spanish oak, 18 inches in diameter, bearing S. 61 deg., E. 50 links distant, and a white oak, 16 inches in diameter, bearing N. 42 deg., W. distant 40 links.

Many witnesses were introduced by the plaintiff, who, beyond all controversy, proved the fact that the corner claimed by Campbell was the corner established by the original surveyor of the lands, under the authority of the United States. A block from one of the witness trees to the middle corner of the south line of the section, which appeared to be of Burr oak, was exhibited to Hugh McAfferty, a chain-carrier and marker when the section was first surveyed, who testified, that he believed the marks in said block of wood to be his; that the markers were not well acquainted with the kind of timber on the Missouri, and that they usually called oak timber white oak when they made their corners in oak timber, particularly what is now called Burr oak, and Chinquepin oak. This evidence was objected to, and excluded by the court, to which an exception was taken.

The court, when requested, refused to instruct the jury, at the instance of the plaintiff, that the quarter section corners established by the surveyors under the United States were to be regarded as the proper corners of quarter sections; and that, however unequal a division of a section might be made, by running dividing lines from these corners, yet they must be adhered to; and instructed the jury, at the instance of the defendant, that they were to take the field notes in evidence, showing the length of the south boundary line of section 21, as being the true length of the line; and further, they are to take the field notes in evidence, as their guide in ascertaining the point equi-distant between the section corners, to ascertain the half-mile corner; and if they believe the half-mile corners do direct and point them to a point mid-way of said section line, as the place designated by the surveyor of the United States as the half-mile corner, there they should place it; and the presumption of law is, that the surveyor placed said corner where the law required him to put it, and if the bearing trees of said half-mile corner cannot be found as designated in the field notes, they should disregard any trees purporting to be bearing trees of said corner, which may be found on the south line of said section, which are placed 20 poles east of the middle or centre of said line.

This case was once before in this Court, (6 Mo. Rep.,) and it appears the same question was then involved which is now submitted to our consideration. We

have no hesitation in pronouncing our conviction of the correctness of the opinion heretofore given in this cause, and are satisfied that although the law, as then declared, may, in a few instances, give some cause of complaint, yet, upon the whole, its expediency and propriety cannot be questioned.

We have been referred to the case of Walters *vs.* Commons, (2 Porter's Ala. Rep.,) as maintaining the doctrine, that in case of sections, the corners and boundaries are established by law, and the purchaser of an entire section must take by those corners and boundaries without regard to the quantity contained within it, whether it be more or less, than that required by law; but that, in reference to the subdivision of sections, when a controversy arises between different claimants, the exact quantity of the section is to be ascertained, and it is to be divided by lines running from courses equi-distant from the section corners, so that the holders of like subdivisions may each obtain the same quantity of the land. We think an examination of the several acts of Congress relative to the surveys of the public lands will expose the error of this opinion. By the ordinance of the 20th of May, 1785, the surveyors of the public domain were required to lay off the same into townships of six miles square, by lines running due north and south, and others crossing them at right angles, as near as may be. The plats of the townships are directed to be marked by subdivisions into lots one mile square, or 640 acres, in the same direction as the external lines; and the surveyors, in running the external lines of the township, were ordered, at the interval of every mile, to mark corners for the lots which were adjacent; always designating the same in a different manner from those of the townships.

The act of the 17th of May, 1796, required that townships should be subdivided into sections, containing as near as may be 640 acres each, by running through the same each way parallel lines at the end of every two miles, and by marking a corner of each of the said lines at the end of every mile. The act of the 10th of May, 1800, prescribes the mode of subdividing sections into half sections of 320 acres each, as nearly as may be, by running parallel lines through the same, from east to west, and from south to north, at the distance of one mile from each other, and marking corners at the distance of each half-mile on the lines running from east to west, and at the distance of each mile, on those running from south to north.

The act of the 26th of March, 1804, authorized the sale of the public lands in quarter sections, and after prescribing a mode of subdividing sections in half and quarter sections, directed that in every instance in which a subdivision of the lands of the United States, as surveyed in conformity to law, shall be necessary, to ascertain the boundaries or true contents of the tract purchased, the same shall be done at the expense of the purchaser.

The act of the 11th February, 1805, prescribes general regulations for dividing townships into sections, and subdividing such sections into half and quarter sections. The following is a summary of these regulations:—The lands are to be laid off in townships of precisely six miles square, by lines running due north and south, and east and west. On each of those lines, at the distance of one mile apart, corners are to be established for sectional lines. Parallel lines are to be

run through the township each way, from each sectional corner, to the corresponding sectional corner on the opposite side of the township, on each of which lines sectional corners are to be established at the distance of one mile apart, which process divides the township into thirty-six sections. In running the exterior township lines, and also the interior sectional lines, intermediate half-mile posts or corners, equi-distant between the corners of the sections, are to be established as the boundaries of quarter sections. This act, then, prescribes, that all the corners marked in the surveys returned by the surveyor-general shall be established as the proper corners of sections and subdivisions of sections which they were intended to designate; and the corners of half and quarter sections not marked on the said surveys shall be placed as nearly as possible equi-distant from those two corners which stand on the same line. The boundary lines actually run and marked in the surveys shall be established as the proper boundary lines of the sections, or subdivisions of sections, for which they were intended; and the boundary lines which shall not have been actually run and marked as aforesaid shall be ascertained by running straight lines from the established corners to the opposite corresponding corners. Each section or subdivision of section, the contents whereof shall have been, or by virtue of this act shall be, returned by the surveyor-general, shall be held and considered as containing the exact quantity expressed in such return or returns; and the half sections and quarter sections, the contents whereof shall not thus have been returned, shall be held and considered as containing the one-half or the one-fourth part, respectively, of the returned contents of the section of which they make part.

From this review of the laws of the United States relating to the survey of the public domain, it will be seen, that at one time no subdivision of sections was made, it being divided into townships and sections only; consequently, no half nor quarter section corners were established on the public surveys. The act of 1800 authorized the sale of half sections, and prescribed a mode of ascertaining the contents thereof; and the act of 26th March, 1804, authorized the sale of the public lands in quarter sections, which were required to be surveyed and the contents thereof ascertained at the expense of the purchaser. Then came the act of 1805, above cited, which prescribed a mode of ascertaining the corners of sections and quarter sections at the expense of the United States. No lands were surveyed in this State until long after the act of 1805. The act of March 3, 1811, first provided for the survey and sale of land west of the Mississippi. At that time the quarter section corners were required to be marked on the surveys, and those corners were, by the act of 1804, to be taken as the true corners; and the provisions of that act, which required the corners of half and quarter sections not marked on the survey to be placed equi-distant from the two corners of the sections, were intended to be applied to surveys made prior to the time when the sale of half sections and quarter sections was authorized. Mr. Gallatin, then at the head of the treasury department, and to whom was entrusted the superintendence of the survey and disposal of the public lands, shortly after the passage of the act of 1805, in a letter of instructions to the surveyor-general, thus speaks of it:—"You will perceive, from the enclosed act, that the principal object which

Campbell vs. Clark.

Congress have in view is, that the corners and boundaries of the sections and sub-divisions of sections should be definitely fixed, and that the ascertainment of the precise contents of each is not considered as equally important. Indeed, it is not so material, either for the United States or for individuals, that purchasers should actually hold a few acres more or less than their surveys may call for, as that they should know with precision, and so as to avoid any litigation, what are the certain boundaries of their tract.

Now, that sections may be sub-divided amongst so many holders, and as valuable improvements are frequently made near lines sub-dividing sections, it would produce great confusion and litigation if the established corners were to be abandoned in subdividing sections, and lines were to be run equi-distant from the corners of sections, in order to subdivide it into quarter sections. The act of 1805 does not direct that the lines shall be so run, except when the corners and marks are not returned on the survey; when they are returned, they are as much respected as the corners of townships or sections, however distant from the centre of the line.

If this view of the law be correct, the court erred in refusing the plaintiff's instructions, and in giving the instruction set out above. That instruction, so far as the facts of this case were concerned, was a mere abstraction, and so much as directed the jury to disregard a corner twenty poles east of the centre of the line, clearly erroneous. Nor was the error cured by the subsequent instruction, that the boundary lines actually run and marked in the survey by the government surveyor are to be taken and considered as the true and proper boundary lines of the sections, or any less subdivision for which they were intended. The only matter before the jury was the credibility of the witnesses; and the jury should have been instructed, that if the witnesses were believed, the facts to which they deposed clearly entitled the plaintiff to recover. The instruction also seems to conflict with that well-settled rule in all surveys, that the courses and distances must yield to an ascertained corner or boundary; (Preston vs. Bowmar, 6 Wheaton's Rep.;) and although they may have been effaced or destroyed, yet if their locality can be established by oral testimony they will prevail, and the courses and distances must yield to them. (2 Bibb, 493.) When the boundaries of land are fixed, known and unquestionable monuments, although neither courses nor distances, nor the computed contents correspond, the monuments must govern. With respect to courses, variations of the needle, errors in the surveying instruments, and other causes, produce error; so mistakes as to the distances may arise from various causes. But monuments remain about them—there is no dispute; and what is uncertain must yield to that which is certain and fixed.—6 Mass., Pearnan vs. Wead.

As this cause will be remanded, it is necessary to express an opinion as to the admissibility of that part of McAafferty's deposition which was excluded by the court. We do not see any objection to the evidence. It was pertinent, and served to establish the locality of the corner in dispute, and we are unable to see the ground on which it was excluded.

The other judges concurring, the judgment is reversed, and the cause remanded.